UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
TIMOTHY WILLIAMS,

                        Plaintiff,

                                          03 Civ. 5342 (RWS)
        - against -

                                          O P I N I O N
CITY OF NEW YORK, et. al.,

                        Defendants.
----------------------------------------X

A P P E A R A N C E S:

        TIMOTHY WILLIAMS
        Plaintiff Pro Se
        # 03A2602
        Elmira Correctional Facility
        P. O. Box 500
        Elmira NY 14902-0911

Attorneys for Defendants:

        HONORABLE ROBERT M. MORGENTHAU
        District Attorney, New York County
        Attorney for Defendant Martha B. Stolley
        One Hogan Place
        New York, NY 10013
        By:  ALAN GADLIN, Assistant District Attorney
                Of Counsel

        HONORABLE MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        Attorneys for Defendant City of New York
                And Ten Individual Defendants
        100 Church Street
        New York, NY 10007
        By:  HILLARY A. FROMMER, ESQ.
                Of Counsel

        LAW OFFICES OF LAWRENCE S. GOLDMAN
        Attorneys for Defendant Hillel Bodek
        500 Fifth Avenue
        New York, NY 10110
        By:  HOWARD S. WEINER, ESQ.
                Of Counsel

APPEARANCES CONTINUED ON FOLLOWING PAGE:

VIACOM LAW DEPARTMENT
Attorney for Defendant Lou Young
1515 Broadway, 51st Floor
New York, NY 10036
By:  NAOMI B. WALTMAN, ESQ.
     <u>Of</u> <u>Counsel</u>

**Sweet, D.J.,**

Defendants Hillel Bodek ("Bodek"), a certified social worker and employee of the Supreme Court of New York County, Martha Stolley ("Stolley"), an assistant district attorney in the Manhattan District Attorney's office, and Lou Young ("Young"), a television evening newscaster for the Columbia Broadcasting System, have moved pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss those claims asserted against them in the complaint of plaintiff Timothy Williams ("Williams"), who is asserting various claims under 42 U.S.C. §§ 1981, 1983, 1985 and 1986. Williams, who is proceeding here pro se, has opposed the motions to dismiss and has moved for leave to file a third amended complaint. Williams also has moved for entry of default judgment as against Bodek. For the reasons set forth below, the motions to dismiss are granted, and Williams' motion for leave to file a third amended complaint is denied. The motion for default judgment as against Bodek is denied.

**Prior Proceedings**

Williams' initial complaint in this matter was received by this District's Pro Se Office on February 6, 2003, alleging violations of 42 U.S.C. § 1983. Specifically, the original complaint alleged that, due to Williams' complaints to the Prisoners' Rights Project of the Legal Aid Society, correctional officers retaliated against him by assaulting him, directing inmates to assault him, and transferring him

to different facilities within Rikers Island.  The complaint further alleged that Williams had been denied medical treatment on several occasions, including after one of the aforementioned assaults.

On July 21, 2003, the Honorable Michael B. Mukasey, Chief Judge, issued an opinion and order granting Williams leave to proceed in forma pauperis, directing the Clerk of Court to assign a docket number to Williams' complaint, dismissing certain of Williams' claims, and directing Williams to file an amended complaint.

Among those claims dismissed were Williams' claims against "City of New York, "NYCDOC (DOI)," "Prisoner Health Services d.b.a. N.Y. City Health and Hospital Corporation," and "N.Y.C. Board of Correction," dismissed in view of Williams' failure to allege facts demonstrating that a municipal policy or custom caused Williams' injury, as is required to sustain a claim under 42 U.S.C. § 1983.  (See July 21, 2003 Opinion and Order, at 2-3 (noting that the latter three entities were agencies of the City of New York and could not be sued).) The claims against Assistant District Attorney ("A.D.A.") Gene Porcaro, A.D.A. Stolley, A.D.A. Ginger James, and A.D.A. Shlomit A. Metz were also dismissed, as the original complaint contained no factual allegations of any involvement by the four A.D.A.'s in a constitutional violation.  The claims against attorneys Tim Mulligan, John Boston and Hilda Diaz, all of the Legal Aid Society, were likewise dismissed in view of Williams' failure to allege facts demonstrating that these defendants had conspired unconstitutionally with state actors or were

otherwise state actors themselves within the meaning of 42 U.S.C. § 1983.  The claims against "Elmhurst Hospital," "Manhattan 'Tombs' Clinic (D.O.C.)," and "Brooklyn House of Detention" were dismissed, as "[a] hospital, clinic and facility . . . are not 'person[s]' within the meaning of § 1983, and therefore, must be dismissed." (Id. at 6.) Additional claims were dismissed for want of factual allegations concerning the personal involvement in any constitutional deprivations of particular individual defendants.

Having disposed of certain of Williams' claims, Chief Judge Mukasey described the prerequisites for stating a claim of excessive force, deliberate indifference, deliberate indifference to medical needs, retaliation, and access to the courts (see id. at 9-14), and directed Williams to submit an amended complaint "in order to detail his allegations of assault, deliberate indifference to medical needs, retaliatory transfers, and access to courts." (Id. at 18.)  It was explained that:

> In order to comply with Rule 8, plaintiff must submit a clear and concise statement regarding his allegation that certain defendants assaulted him and that he was denied needed medical attention.  Plaintiff must specify how many assaults occurred, when they occurred and who was responsible for the alleged assaults by providing a clear chronological narrative as to what exactly happened. Plaintiff must give the dates of all relevant events, the names of all relevant persons and a description of what actually occurred.  Plaintiff must also describe how each defendant named in the amended complaint was personally involved in each alleged event... .  Plaintiff must also detail his exhaustion within the DOC [Department of Corrections] system as to each grievable claim.

(<u>Id.</u> (internal footnote omitted).)

Williams filed his first amended complaint on August 21, 2003, and on September 22, 2003 this action was reassigned to this Court. Thereafter, Williams sought leave to file a second amended complaint, which application was granted in an order dated January 22, 2004. Williams filed his second amended complaint (the "SAC"), the operative complaint for purposes of the motions discussed herein, on March 26, 2004. The SAC names over fifty defendants, including some twenty "John Doe" defendants.[1]

Defendant the City of New York (the "City") brought a letter application dated June 29, 2004 seeking an order compelling Williams to execute certain releases with regard to medical information and extending the City's time to file an answer to the SAC. Thereafter, in October 2004, the City's motion for an order compelling Williams to execute the releases was granted, Williams' motion for default judgment as against the City was denied, and the City's time to answer the SAC extended through December 31, 2004.

In the interim, on June 30, 2004, Stolley moved to dismiss the SAC, and on August 2, 2004 Williams' motion for default judgment

---

[1] Subsequent to the filing of the SAC, Williams withdrew his claims against two named defendants, A.D.A. Shlomit Metz and Assistant Deputy Warden Charles DiBernardino, which were dismissed without prejudice on October 14, 2004. Williams also stipulated to the dismissal of his claims against Tim Mulligan of the Legal Aid Society with prejudice by order entered on November 8, 2004.

against Stolley was denied in view of the timely filing of Stolley's motion to dismiss. Stolley's motion was adjourned and subsequently taken on submission upon receipt of Stolley's reply papers on October 20, 2004. Both Bodek's motion for summary judgment[2] and Williams' motion for default judgment as against Bodek were deemed fully submitted on September 29, 2004. Young's motion to dismiss the SAC, filed on August 17, 2004, was deemed fully submitted on October 27, 2004 upon receipt of Williams' surreply dated October 15, 2004.

By letter dated July 9, 2004 Williams sought leave to file a third amended complaint. The letter was deemed treatable as a motion, and, following an adjournment, was taken on submission on September 29, 2004. Meanwhile, Williams submitted a letter dated September 10, 2004 seeking comparable relief. Williams' second letter was deemed treatable as a motion, and following opposition to the amendment and receipt on December 10, 2004 of reply papers from Williams dated December 4, 2004, the motion was deemed fully submitted.[3]

Williams' application for appointment of counsel was granted on July 21, 2004, and his request forwarded to the Pro Se Office. To date, no attorney from the District's Pro Bono Panel has filed a notice

---

[2] Bodek's motion papers, originally filed electronically on July 29, 2004, were refiled in paper form on October 12, 2004 and are being given nunc pro tunc effect.

[3] Williams' third letter seeking leave to file a third amended complaint, dated October 4, 2004, has been considered in conjunction with his prior applications for identical relief, but has not been treated as a separate motion.

of appearance on Williams' behalf.[4]

**The Facts**

The following factual background is drawn from the allegations of the SAC. These allegations are accepted as true for the purposes of this motion, see Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002), and do not constitute findings of fact by the Court. As the SAC totals some 45 pages, not counting the appended exhibits, and contains some 160 paragraphs, only those allegations necessary to provide a general background concerning Williams' claims or pertinent to the particular motions discussed herein are set forth below.

Williams was, at all times relevant, a pretrial detainee and prisoner in the custody of the New York City Department of Correction ("DOC"), detained at various Rikers Island jails. (See SAC at ¶ 3.)

It is alleged that Stolley is and was at all times relevant an employee of the Manhattan District Attorney's Office. (See SAC at ¶ 18.) It is further alleged that Bodek is and was at all relevant times an employee of the Supreme Court of New York County in the State

_____

[4] See generally Mallard v. United States Dist. Ct., 490 U.S. 296 (1989) (explaining that federal courts may only request that an attorney represent a litigant proceeding in forma pauperis and pro se in any civil action other than a habeas corpus matter and may not compel such representation).

of New York (<u>see</u> SAC at ¶ 22) and that Young is and was at all relevant times a television evening newscaster for the Columbia Broadcasting System. (<u>See</u> SAC at ¶ 56).

According to the SAC, on or about October 6, 2000, Williams, also known as "Timothy Harris" and "Timothy Harris-Williams," left his place of employment and was seen at the New York Harbor Veteran's Medical Center (the "V.A.") emergency room after suffering from "severe manic-depressive and manic-psychotic episodes." (SAC at ¶ 60.) Williams was subsequently committed to the locked ward of the V.A.'s psychiatric ward where, hours later, Williams allegedly experienced another manic-psychotic episode, requiring him to be placed in isolation and strapped to a bed in leather restraints. (<u>See</u> <u>id.</u>)

On or about October 13, 2000, Williams "eloped from the custody of the V.A.'s locked psychiatric ward against medical advice" and without a prescription for his psychiatric medications. (SAC at ¶ 61.) On or about October 15, 2000, Williams became involved in an altercation in the vicinity of Tenth Avenue and West 57th Street in Manhattan after wandering the streets of midtown Manhattan unmedicated. (<u>See</u> SAC at ¶ 62.) The police arrived on the scene, and Williams was questioned from approximately 10:00 p.m. on October 15 until 4:30 a.m. on October 16, 2000. (<u>See</u> SAC at ¶ 63.) Williams alleges that he was denied medical attention, food and medications during this time, and that defendant Officer Raymond Elie-Pierre ("Elie-Pierre") was aware that Williams was a patient at the V.A.'s psychiatric ward because

Williams' plastic medical wrist bracelet was in full view. ( See SAC at ¶ 62-63.)  Stolley "was then notified."  (SAC at ¶ 63.)

According to Williams, Stolley was aware that he was an "escapee from a psychiatric ward," but instructed Elie-Pierre and defendant Detective Judith Sena ("Sena") to cover up the fact that Williams had recently been committed at the V.A.'s psychiatric ward. (SAC at ¶ 64.)  It is alleged that Stolley assisted Elie-Pierre and Sena to create probable cause to sustain his arrest and to obtain an indictment. (See id.)  It is further alleged that Stolley contacted Williams' past employers, psychiatrists and friends before a grand jury was set to hear the indictment and that, on or about October 24, 2000, Stolley contacted Williams then-counsel and instructed him not to obtain Williams' official records from the V.A. until such time as Williams was persuaded to accept a plea bargain.  (See id.)

According to Williams, a facsimile sent by Stolley to Williams' psychiatric expert, Dr. Ruth Finch, in which Stolley "advanced her unprofessional and personal feelings that the plaintiff was a 'SICK COOKIE'" is further evidence that Stolley's activities were not intimately associated with the judicial phase of the criminal process. (SAC at ¶ 65.)  Williams also asserts that records from the Manhattan District Attorney's "Trial Bureau 30" office reveal that Stolley has engaged in selective enforcement.

On or about June 10, 2001, while Williams was still a

10

pretrial detainee remanded to the custody of DOCS at Rikers Island, he witnessed correction officers harassing a 73-year-old detainee. (See SAC at ¶ 68.) Williams thereupon contacted a number posted on most of the jail's walls concerning reports of corruption. (See id.) When word of his complaints reached correction officers, Williams was called a "snitch" and began to be harassed. (See id.) Williams alleges that his mail was monitored and intercepted (see SAC at ¶ 69), that bail monies sent to Williams were taken by a correction officer (see SAC at ¶ 70), and that he was repeatedly transferred several times between August 15, 2001 and December 10, 2001 in retaliation for reporting corruption. (See SAC at ¶ 72). According to the SAC, Williams was warned on several occasions that he would suffer repercussions if he persisted in reporting corruption. (See SAC at ¶¶ 73-74.) On or about October 24, 2001, Williams wrote several letters to the Prisoner's Rights Project of the Legal Aid Society, the Commissioner of Correction, and the Inspector General's office to alert them of "the threats of bodily harm he was receiving from various correction officers." (SAC at ¶ 73.)

On November 3, 2001 a correction officer allegedly placed what was deemed a weapon under the bedframe of Williams' cell, for which Williams was given a disciplinary infraction and placed on RED ID restraint status, as well as being rearrested for criminal possession of a weapon. (See SAC at ¶ 75.) Williams alleges that other weapons were placed or thrown in his cell when he was not present during November and December 2001 and that he contacted the Prisoner's Rights

Project again during that time. (See SAC at ¶ 76.) He further alleges
that correction officers ignored his request for a seatbelt when being
transported to Manhattan Supreme Court on January 8, 2002 and that,
upon his return that evening, the bus in which he was riding was struck
and Williams was injured. (See SAC at ¶¶ 78-79.) Williams alleges
that subsequently he was denied access to medical care. (See SAC at ¶
79.)

Williams was transferred again on February 1, 2002, this time
to the G.R.V.C. (Beacon) jail, where he alleges he was assaulted by a
correction officer on February 19, 2002. (See SAC at ¶¶ 80-81.) After
making several complaints about his injuries and further assaults,
Williams was transferred to the A.M.K.C. C-71 jail, where he was
allegedly assaulted again. (See SAC at ¶ 82.) Williams was then moved
to several A.M.K.C. C-71 jail housing units and it is alleged that
correction captains gave inmates cigarettes to assault Williams, and
that the A.M.K.C. jail clinic refused to afford Williams adequate
medical treatment despite a worsening in his lower back, shoulder and
arm injuries stemming from the January 8 bus incident. (See SAC at ¶
83.) Williams' complaints to the warden of A.M.K.C. jail in March 2002
were allegedly ignored. (See SAC at ¶¶ 84-85.)

On or about April 29, 2002 and April 30, 2002, Williams was
approached by correction officers and captains who allegedly questioned
him repeatedly about whether he was "snitching" to the authorities
about corruption in the DOC and whether he was investigating a murder

which occurred in a housing unit at the jail. (<u>See</u> SAC at ¶ 86.) During the morning shift of April 30, 2002, a correction officer ordered inmates to assault Williams. (<u>See</u> <u>id.</u>) While he was being assaulted by inmates, Williams was kicked by several correction officers. (<u>See</u> <u>id.</u>) Williams received five fractures "to his face and orbit, substantial damage to his low-back and spine, and trauma to the head." (SAC at ¶ 87.) Williams alleges that the DOCS medical staff at every facility to which Williams was transferred between April 30, 2002 and May 3, 2003 refused to send Williams to see an eye specialist or conduct an M.R.I. exam to determine the extent of Williams' injuries. (<u>See</u> <u>id.</u>)

On or about May 18, 2002 and May 20, 2002 Williams attempted to inform the N.Y.C. Board of Correction and the Inspector General's office of the threats, harassment and failures to protect him which he had endured. (<u>See</u> SAC at ¶ 88.) On or about June 1, 2002, Williams, through a Legal Aid advisor, contacted the Bronx District Attorney's office and requested the opportunity to press charges against the correction staff and detainees who had been ordered to assault him. (<u>See</u> SAC at ¶ 89.) Williams' requests were ignored, and the A.D.A. with whom Williams met alerted officials at DOCS concerning Williams intent to press charges. (<u>See</u> <u>id.</u>)

It is alleged that, following renewed harassment by correction officers beginning on or about June 8, 2002, Williams was transferred back to A.M.K.C. C-71 in August 2002. (<u>See</u> SAC at ¶ 92,

95.)  On or about October 1, 2002, Williams became aware that Stolley
was attempting "to impede plaintiff's due process protections by
injecting herself into plaintiff's difficulties with D.O.C. mental
health staff."  (SAC at ¶ 96.)  According to Williams, Stolley
requested that Bodek attempt to elicit the help of William's former
psychiatrists to interfere with Williams' trial. (<u>See</u> <u>id.</u>) Bodek
allegedly contacted the V.A. in the hopes of eliciting testimony which
would be "devastating" to Williams' criminal case in Manhattan Supreme
Court.  (<u>Id.</u>)

It is alleged that from October 2002 through May 2003
Williams was repeatedly transferred, his medical needs not addressed,
and his access to the courts hindered. (<u>See</u> SAC at ¶¶ 97-104.)  On or
about December 20, 2002, Williams once again sustained injuries when a
DOCS bus in which he was being transported (without a seatbelt) hit a
road bump. (<u>See</u> SAC at ¶ 103.)  Williams alleges that on May 2, 2003
he was brought to a secluded area of the Brooklyn House of Detention
for Men by a correction officer and sodomized with a plastic fork.
(<u>See</u> SAC at ¶ 105.)  Williams was subsequently brought to Bellevue
Hospital and a rape kit was secured.  (<u>See</u> <u>id.</u>)  Williams was
transferred again on May 30, 2003 back to the Rikers Island N.I.C.
jail, where he was assaulted by a correction officer and rushed to
Elmhurst Hospital's emergency room. (<u>See</u> SAC at ¶ 107.)  On July 5,
2003, a correction captain ordered another inmate to bite Williams'
thumb, an injury that required stitches.  (<u>See</u> SAC at ¶ 109.)

On July 15, 2003, an investigator was assigned to assist Williams in proceedings involving the weapon placed in his cell by correction staff. (See SAC at ¶ 110.) On July 16, 2003, the investigator, Louis Lilla ("Lilla"), visited Williams at the N.I.C. jail. (See SAC at ¶ 111.) After presenting information to Lilla, Williams was returned to his N.I.C. housing unit where correction officers took Williams to an obscure area and sodomized him repeatedly with a fountain pen. (See id.) On July 25, 2003, the Prisoners' Rights Project complained to the DOC chief about the transfer of Williams back to the A.M.K.C. C-71 jail, where Williams had sustained five fractures to his face, as well as other injuries. (See SAC at ¶ 113.) On August 10, 2003, Williams' legal advisor wrote a separate letter concerning the danger posed to Williams. (See id.)

On August 14, 2003, attorney Anthony Grandinette ("Grandinette"), at the behest of Lilla set up an interview for Williams with Young. (See SAC at ¶ 115.) Williams alleges that he informed Grandinette and Young that he would only consent to the interview (which was to address DOC corruption and the sodomy assault on Williams on July 16, 2003) if he would be assured safe placement in a facility not associated with the Rikers Island, DOC Complex. (See id.) Young and Grandinette allegedly agreed to have Williams moved from the O.B.C.C. facility immediately following the interview. (See id.) Williams then detailed the DOC corruption that he had witnessed while correction staff looked on. (See id.) Once the interview was over, Young did not receive a signed consent agreement

from Williams for the interview to take place, and Williams was never moved from the O.B.C.C. facility to a safe facility. (See id.) Williams alleges that he was later attacked and sustained a wound to his head that required eight stitches. (See id.)

On October 10, 2003 Grandinette filed a claim against the City and the DOC on Williams' behalf. (See SAC at ¶ 116.) Williams was subsequently transferred back to the A.M.K.C. C-71 jail on October 14, 2003, and his legal work and property were confiscated. (See SAC at ¶ 117.) Williams was transferred again on October 28, 2003, this time to the Five Points Correction Facility. (See SAC at ¶ 118.) It is alleged that the medical staff of the various facilities where Williams was held between June 16, 2003 and October 28, 2003 refused to transport Williams to his medical appointments (see SAC at ¶ 126), and that from October 28, 2003 until early 2004, various medical staff have denied him adequate medical care. (See SAC at ¶ 127).

According to Williams, he has exhausted every "conceivable . . . redress available to him" between June 28, 2001 and February 15, 2004. (SAC at ¶ 128.)

The SAC contains ten counts denominated as such. Count Three, entitled "Malicious Prosecution, Conspiracy, Abuse of Process[,] Discrimination On The Basis Of Race, Unconstitutional Policies And Customs," is the sole count asserted against Stolley and Bodek. (See SAC at ¶¶ 137-140.) Count Eight, entitled "Conspiracy, Breach Of Duty

To Protect," is the only count asserted as to Young.  (<u>See</u> SAC at ¶¶ 154-156.)

## Discussion

In considering Williams' pleading and his other papers submitted in this matter, the Court is mindful that Williams is proceeding <u>pro</u> <u>se</u> and that his submissions should be held "'to less stringent standards than formal pleadings drafted by lawyers . . . .'" <u>Hughes v. Rowe</u>, 449 U.S. 5, 9 (1980) (per curiam) (quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972)); <u>see</u> <u>also</u> <u>Ferran v. Town of Nassau</u>, 11 F.3d 21, 22 (2d Cir. 1993).  Indeed, district courts should "read the pleadings of a <u>pro</u> <u>se</u> plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'"  <u>McPherson v. Coombe</u>, 174 F.3d 276, 280 (2d Cir. 1999) (quoting <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994)).  Nevertheless, <u>pro</u> <u>se</u> status "does not exempt a party from compliance with relevant rules of procedural and substantive law."  <u>Traguth v. Zuck</u>, 710 F.2d 90, 95 (2d Cir. 1983) (quotation marks omitted).

I.   ***The Motions To Dismiss Are Granted and Williams' Motion For Default Judgment As Against Bodek Is Denied***

A.   **The Rule 12(b)(6) Standard**

In considering a motion to dismiss pursuant to Rule 12(b)(6),

**17**

Fed. R. Civ. P., the Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," Chambers, 282 F.3d at 152 (citing Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In other words, "'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir. 2000); accord Eternity Global Master Fund, 375 F.3d at 176-77.

B.    **Bodek's Motion To Dismiss Is Granted And Williams' Motion For Default Judgment As Against Bodek Is Denied**

Bodek moves to dismiss the claims in the SAC asserted against him, contending that Williams fails to state a claim upon which relief

can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).
Specifically, Bodek asserts that he is entitled to absolute immunity
from suit as he was performing a quasi-judicial function at the
direction and discretion of the Honorable James Yates, Justice of the
Supreme Court of the State of New York.

In Dorman v. Higgins, 821 F.2d 133 (2d Cir. 1987), the Second
Circuit extended absolute immunity to federal probation officers who
prepare presentence reports at the request of district court judges.
While the Court recognized that "judges performing judicial functions
within their jurisdictions are granted absolute immunity," the Court
expanded the protection of absolute immunity to federal probation
officers because "it is clear that, in preparing pre-sentence reports,
a federal probation officer acts as an arm of the court and that that
task is an integral part of one of the most critical phases of the
judicial process."  Id. at 137 (emphasis added).

The Second Circuit further instructs in King v. Simpson, 189
F.3d 284 (2d Cir. 1999), that a district court tasked with deciding a
motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., must
determine "whether an official is entitled to absolute immunity [by
taking] a functional approach and look[ing] to the particular acts or
responsibilities that the official performed." Id. at 287-89 (citing
Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999)).  In particular,
a court must conduct a factual inquiry to assess whether the duties
performed by the official were judicial or prosecutorial in nature,

**19**

thus affording the official absolute immunity, or whether the duties were merely administrative, thereby only affording qualified immunity to the official. See Stewart v. Lattanzi, 832 F.2d 12, 13 (2d Cir. 1987) (per curiam).

In this case, the record reflects that on February 22, 2002, Judge Yates designated Bodek as the court-appointed special master and mental health expert in the state's case against Timothy Williams. See Affidavit of Hillel Bodek, July 29, 2004, ¶ 3. Judge Yates directed Bodek to interview Williams to determine where Williams had received psychiatric treatment in the past and subsequently to arrange any records of psychiatric evaluation or treatment be made available to Williams. As Williams had asked the Court to proceed pro se in his criminal trial and as he indicated that he needed access to these psychiatric records in order to mount his defense of choice, Judge Yates assigned Bodek the responsibility of obtaining these records. Id. After Bodek initially met with Williams, Williams authorized Bodek to collect his records. Id. at ¶ 7.

Although Williams later rescinded his consent to release these records, Judge Yates instructed Bodek to go forward, which he did. Id. at ¶ 10. In the following months, Judge Yates requested Bodek to assist with two other issues raised by Williams, and Bodek complied. Id. at ¶ 14. Accordingly, in all instances in which Bodek took action, he "acted as an arm of the court" in full satisfaction of the Dorman standard. At no point did Bodek act in his personal

capacity and at no point did Bodek take any executive decisions independent of Judge Yates' instructions.  Thus, Bodek, as court-appointed special master and mental health expert, is entitled to absolute immunity for the performance of quasi-judicial functions that were integral to the judicial process.  Williams fails to state an actionable claim against Bodek in the SAC pursuant to Rule 12(b)(6), and, consequently, the claims against Bodek in the SAC are dismissed with prejudice.

Furthermore, Williams' motion for default judgment as against Bodek is denied.  As a motion to dismiss may be made in lieu of an answer pursuant to Rule 12, Fed. R. Civ. P., by virtue of Bodek's timely service of his motion to dismiss on Williams, no basis exists for entry of default judgment.  Williams affected service of the SAC on Bodek on July 8, 2004.  The twenty day response clock began running the next day on July 9, 2004, under Rule 6(a), Fed. R. Civ. P., and Bodek successfully served Williams on July 29, 2004 when Bodek mailed his motion to dismiss to Williams.  <u>See</u> Rule 5(b)(2)(B), Fed. R. Civ. P. (asserting service by mail is complete on mailing).  Although some confusion arises as to when the document was filed successfully with the Clerk of Court, for Bodek mistakenly attempted to file his motion to dismiss electronically, service was made upon Williams in a timely manner and in full compliance with Rule 12(a)(1)(A), Fed. R. Civ. P., thereby negating the basis for Williams' motion for default judgment.

### C.    <u>Stolley's Motion Is Granted</u>

Invoking Rule 12(b)(6), Fed. R. Civ. P., Stolley has moved to dismiss the sole claim of the SAC asserted against her.  In particular, she argues that the July 21, 2003 Opinion and Order dismissed the claims against her, and Williams was not granted leave to amend with respect to her.  Stolley further argues that the law-of-the-case doctrine mandates the dismissal of claims effectively restating claims previously dismissed.  Insofar as Williams' claims may be read to attack the validity of his conviction, Stolley argues that his claims are not cognizable under 42 U.S.C. § 1983.  Finally, it is asserted that Williams' claims against Stolley are barred by the doctrine of prosecutorial immunity, that any claim Williams may be inferred to have made against Stolley in her official capacity is barred under § 1983 and the Eleventh Amendment to the U.S. Constitution, and Williams' factual allegations fail to state a claim.

"The doctrine of the law of the case 'posits that if a court decided a rule of law, that decision should continue to govern in subsequent stages of the same case.'" Aramony v. United Way, 254 F.3d 403, 410 (2d Cir.2001) (citing In re Crysen/Montenay Energy Co., 226 F.3d 160, 165 n.5 (2d Cir.2000), cert. denied, 532 U.S. 920 (2001)).  "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." Id. (citation omitted).  Application of the law of the case doctrine is discretionary, however, "and does not limit a court's power to reconsider its own decisions prior to final judgment." Id. (quoting Crysen/Montenay, 226 F.3d at 165 n.5 (quoting

Sagendorf-Teal v. County of Rensselaer, 100 F.3d 270, 277 (2d Cir.1996))).

Under the circumstances presented, it is not necessary to revisit Chief Judge Mukasey's decision. As Chief Judge Mukasey stated on July 21, 2003, Williams' claims against A.D.A. Stolley were dismissed for failure to state an actionable claim, given A.D.A. Stolley's absolute immunity from civil suit for alleged acts committed within the scope of her official duties. Because Chief Judge Mukasey found that all of Williams' claims arose out of conduct allegedly occurring in the course of Stolley's role as an advocate for the state, suit against her in both her personal and official capacity was barred. By granting leave to amend the complaint as to specific allegations only, namely Williams' allegations of assault, deliberate indifference to medical needs, retaliatory transfers, and access to courts, none of which implicated A.D.A. Stolley, the Chief Judge implicitly precluded Williams from introducing further claims against A.D.A. Stolley, thereby firmly resolving this issue. Accordingly, Stolley's motion to dismiss is granted and all claims in the SAC against her are dismissed with prejudice.

### D.    Young's Motion Is Granted

Young has moved pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the SAC as against him for failure to state a claim and failure to comply with Rule 8, Fed. R. Civ. P., which requires that a

pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In particular, Young asserts that the allegations that he engaged in a conspiracy and breached a purported "duty to protect" are insufficient to state a claim. In reply to Williams' opposition papers suggesting that Young violated Williams' constitutional right to be protected from cruel and unusual punishment, Young also argues that he is not a state actor and, thus, may not be held liable for any violation of Williams' constitutional rights as a matter of law.

"'To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act.'" Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) (quoting Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992)); see also Webb v. Goord, 330 F.3d 105, 110 (2d Cir. 2003) ("In order to maintain an action under Section 1985 [pertaining to conspiracies], a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.'") (quoting Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). Drawing all appropriate inferences in Williams' favor, there are simply no factual allegations in the SAC suggesting that Young acted in concert with any state actor such as would permit a claim against Young, a non-state actor, to proceed. At most, Young is alleged to have agreed with attorney Grandinette and Williams "to have

plaintiff moved from the O.B.C.C. facility immediately following the C.B.S. interview." (SAC at ¶ 115.) There is no allegation that Young ever reached any such agreement with a DOCS official or other state actor, and there is nothing in the SAC from which it might be inferred that Grandinette was himself a state actor. Williams' assertion in his surreply papers that Young was acting as the agent of DOCS when he and his news crew conducted an interview of Williams at OBCC finds no support in the factual allegations of the SAC.

Moreover, even if an agreement between Young and a state actor had been alleged in the complaint, the only apparent aim of such an agreement -- to have Williams moved from the facility where he was being held to a safer facility -- does not represent a deprivation of Williams' claimed constitutional right to be protected from cruel and unusual punishment or otherwise suggest a violation of Williams' constitutional rights, including his right to due process. Indeed, Williams alleges that he was subsequently attacked and sustained a wound to his head as a result of <u>not</u> having been moved from the facility in question, tending to suggest the desirability of the purportedly agreed-upon move rather than any detrimental, much less unconstitutional, effect. Insofar as Williams alleges that he was injured as the result of being kept at the OBCC facility rather than being moved to a safer facility, there are no factual allegations to suggest Young's involvement in such a decision.[5]

_____

[5] Williams has also alleged that after the interview was concluded Young did not receive a signed consent agreement from Williams "for the

**25**

Williams argues in the alternative that, even if the allegations of the SAC are not sufficient to state a claim under 42 U.S.C. § 1983, "there are surely parallel state claims that should be applicable where defendant Young did not obtain a proper consent to interview plaintiff, in the presence of D.O.C. officials, about such an explosive subject as D.O.C. corruption and the abuse of pretrial inmates at the hands of correction staff." (Pl. Oct. 15, 2004 Letter, at 2.)  In view of Williams' <u>pro</u> <u>se</u> status, the SAC must be construed liberally in order to determine whether the facts allege state a claim against Young.  Nonetheless, "<[l]iberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader.  If it fails to do so, a motion under Rule 12(b)(6) will be granted.'" <u>Fieldcamp v. City of New York</u>, 242 F. Supp. 2d 388, 389 (E.D.N.Y. 2003)(citation omitted and alteration in original).

No actionable claim is evident based on Young's mere alleged failure to obtain a written consent to an interview with Williams where Williams proceeded with the interview notwithstanding the absence of written consent (<u>see</u> SAC at ¶ 115) and, by Williams' own admission, the interview was never aired on television.  <u>See</u> <u>generally</u> <u>Finger v. Omni</u>

---

interview to take place at the O.B.C.C. facility." (SAC at ¶ 115.) Assuming, for purposes of this motion, the truth of the allegation, any failure by Young to obtain a signed consent agreement from Williams does not give rise to an inference of conspiracy here or otherwise amount to a constitutional violation.

<u>Publications Int'l, Ltd.</u>, 77 N.Y.2d 138, 564 N.Y.S.2d 1014, 566 N.E.2d 141 (N.Y. 1990) (discussing statutory limitations on the use for advertising or trade purposes of a person's name or picture without written consent under New York Civil Rights Law § 51 and the existence of a "newsworthiness exception" to these limitations).

Nor does Williams' allegation of Young's breach of a duty to protect him state an actionable negligence claim. It is axiomatic that a duty of care may be found only where a defendant has sufficient control over an incident or location to be in a position to prevent the negligence. <u>See</u>, <u>e.g.</u>, <u>Duke v. Bethlehem Cent. Sch. Dist.</u>, 216 A.D.2d 838, 629 N.Y.S.2d 97 (N.Y. App. Div. 3d Dep't 1995); <u>McGrath v. United Hosp.</u>, 167 A.D.2d 518, 562 N.Y.S.2d 193 (N.Y. App. Div. 2d Dep't 1990); <u>Cohen v. City of New York</u>, 128 A.D.2d 748, 513 N.Y.S.2d 459 (N.Y. App. Div. 2d Dep't 1987); <u>Vogel v. West Mnt. Corp.</u>, 97 A.D.2d 46, 470 N.Y.S.2d 475 (N.Y. App. Div. 3d Dep't 1983). There is no allegation that Young exercised any control over Williams' assignment to a particular correctional institution or any other aspect of the conditions under which Williams was being held such as might arguably give rise to a duty of care on Young's part. Likewise, there are no factual allegations giving rise to an inference that Young promised to have Williams moved from OBCC while harboring a preconceived and undisclosed intention of not performing the promise, such as might support a fraud claim. <u>See</u> <u>generally</u> <u>Sabo v. Delman</u>, 3 N.Y.2d 155, __, 164 N.Y.S.2d 714, __, 143 N.E.2d 906, 908 (N.Y. 1957).

Under New York law, a conspiracy to commit a tort is not, itself, actionable. As the New York Court of Appeals has explained, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort . . . ." Alexander & Alexander Inc. v. Fritzen, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, __, 503 N.E.2d 102, __ (N.Y. 1986) (internal quotations and citations omitted). There is no "otherwise actionable tort" here attributable to Young for the reasons just stated nor any identifiable actionable tort to which allegations of conspiracy connect Young.

Finally, Williams has not pled the rudiments of any other state causes of action against Young.

As Williams repeatedly has failed to state a claim under 42 U.S.C. § 1983 against Young, any further attempt appears futile, and his claims, to the extent asserted under 42 U.S.C. § 1983 or construed under 42 U.S.C. § 1985, are dismissed with prejudice.

## II. **Williams' Motion For Leave To Amend His Pleading Is Granted**

### A. **The Rule 15(a) Standard**

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the

part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962); <u>see also</u> <u>SCS Communications</u>, 360 F.3d at 345 ("[U]nder Fed. R. Civ. P. 15(a), leave to amend a pleading may <u>only</u> be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original); <u>Littlejohn v. Artuz</u>, 271 F.3d 360, 363 (2d Cir. 2001) ("[A]lthough Rule 15 requires that leave to amend be 'freely given,' district courts nonetheless retain the discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive.").

To determine whether there would be undue prejudice from a proposed amendment, a court must consider whether the new aspects of the proposed pleading would "'(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" <u>Monahan v. New York City Dep't of Corrs.</u>, 214 F.3d 275, 284 (2d Cir. 2000) (quoting <u>Block v. First Blood Assocs.</u>, 988 F.2d 344, 350 (2d Cir. 1993)). Delay alone, in the absence of a showing of undue prejudice or bad faith, typically provides an insufficient basis for denying a motion to amend. <u>See</u> <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 339 (2d Cir. 2000); <u>Rachman Bag Co. v. Liberty Mut. Ins. Co.</u>, 46 F.3d 230, 234-35 (2d Cir. 1995) (citing <u>State Teachers Ret. Bd. v. Fluor Corp.</u>, 654 F.2d 843, 856 (2d Cir. 1981)). "The party opposing

the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." Fariello v. Campbell, 860 F. Supp. 54, 70 (E.D.N.Y. 1994) (citing Panzella v. Skou, 471 F. Supp. 303, 305 (S.D.N.Y. 1979)); see also European Cmty. v. RJR Nabisco, Inc., 150 F. Supp. 2d 456, 502-03 (E.D.N.Y. 2001) (citing Saxholm AS v. Dynal, Inc., 938 F. Supp. 120, 123 (E.D.N.Y. 1996)).

Likewise, the party opposing a motion to amend bears the burden of establishing that an amendment would be futile. See Blaskiewicz v. County of Suffolk, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998) (citing Harrison v. NBD Inc., 990 F. Supp. 179, 185 (E.D.N.Y. 1998)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Oneida Indian Nation of New York v. City of Sherrill, New York, 337 F.3d 139, 168 (2d Cir. 2003) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)), cert. granted, 124 S. Ct. 2904 (2004); see also A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 87 F. Supp. 2d 281, 298 (S.D.N.Y. 2000) (explaining that if the proposed amendment "would be subject to 'immediate dismissal' for failure to state a claim or on some other ground, the Court will not permit the amendment") (quoting Jones v. New York State Div. of Military & Naval Affairs, 166 F.3d 45, 55 (2d Cir. 1999)).

## B.  Leave to Amend is Denied

Williams not only has been given a chance to amend his

complaint in order state a claim, but Chief Judge Mukasey, in his July 21, 2003 Order, laid out in sufficient detail the elements that a properly pleaded complaint would need to include. Despite this guidance, Williams has filed two subsequent complaints, each of which contained respective deficiencies, and now he moves to file a third amended complaint, or in laymen's terms, he wants a fourth bite at the apple. Now, Williams seeks to include the names of eleven individuals whom he had referred to previously as "John Doe" defendants, arguing that he was unable to identify these individuals' names earlier. Williams, however, again makes no explicit allegations with respect to any of these newly-named individuals that would state a claim in satisfaction of Rule 12(b)(6), Fed. R. Civ. P.

There is no indication that granting plaintiff leave to amend a fourth time would provide an opportunity to correct the failings in the previously filed amended complaints. Williams has been cautioned that he must detail explicitly how each named defendant harmed him, providing a clear, concise and chronological narrative that asserts specific allegations about the personal involvement of each defendant in any alleged constitutional violation. However, Williams has failed to do so with respect to any of these newly named defendants. He has failed to remedy the defects of the earlier filed complaints in the face of repeated guidance. Granting leave to amend would therefore be futile.

In light of the previous grants of leave to amend, Williams'

certain pleading deficiencies and what the court would require.

In re Merrill Lynch & Co. Research Reports Sec. Litig., -- F.Supp. 2d --, 02 MDL 1484, 2003 WL 21920386, at *9 (S.D.N.Y. Aug.12, 2003). "As Judge Friendly noted in Denny v. Barber, 576 F.2d 465, 471 (2d Cir.1978), where a district judge puts plaintiff's counsel 'on the plainest notice of what was required,' justice does not require the court to 'engage in still a third go-round.'" Moran v. Kidder Peabody & Co., 617 F.Supp. 1065, 1068 (S.D.N.Y. Sept. 30, 1985), aff'd mem., 788 F.2d 3 (2d Cir.1986). While this Court has permitted Williams a third go-round, this Court finds granting leave for a fourth attempt to be futile.

## Conclusion

The respective motions to dismiss the second amended complaint filed by Bodek, Stolley and Young are granted. Williams' motion for default judgment as against Bodek is denied. Williams' request for leave to file a third amended complaint is denied.

It is so ordered.

New York, NY
April   /9        , 2005

ROBERT W. SWEET
U.S.D.J.